# IN THE DISTRICT COURT OF THE UNITED STATES

## For the Western District of New York

———————————

|  |  |
|---|---|
| | NOVEMBER 2008 GRAND JURY<br>(Empaneled 11/07/2008) |
| **THE UNITED STATES OF AMERICA** | |
| *-vs-* | **INDICTMENT** |
| **GREGORY MAGNESS,**<br>**JUSTIN MAGNESS,**<br>**SUPERIOR METAL POWDERS, INC.,**<br>**CHARLES WRIGHT,**<br>**WILLIAM NEHILL,**<br>**INTERNATIONAL TECHNOLOGY GROUP, INC.,**<br>**ELDON BOTT,**<br>**INNOVATIVE MATERIALS & SOLUTIONS, INC.,**<br>**and**<br>**QIAN CHEN** | Violations:<br><br>Title 18, United States<br>Code, Sections 371, 1343<br>and 2.<br><br>[2 Counts]<br>[2 Forfeiture Allegations] |
| **Defendants** | |

**INTRODUCTORY ALLEGATIONS**

At all times relevant to this Indictment:

**The Parties:**

1.    Defendant CHARLES WRIGHT was the President of ESM Group,
Inc. ("ESM").  ESM was in the business of supplying speciality
metal powders, including magnesium, primarily to the steel
industries.  Headquartered in Amherst, New York, in the Western

1

District of New York, the production of the specialty metal powders occurred at various ESM facilities in the United States including one located in Saxonburg, Pennsylvania.

2.    Defendant SUPERIOR METAL POWDERS, INC. ("SUPERIOR METAL") located in Franklin, Pennsylvania, was a closely held corporation. Defendant GREGORY MAGNESS was President and defendant JUSTIN MAGNESS was Vice-President.   SUPERIOR METAL was also in the business of supplying specialty metal powders, including magnesium, to various industries.

3.    Defendant   INTERNATIONAL   TECHNOLOGY   GROUP,   INC. ("INTERNATIONAL TECHNOLOGY") was located in Orchard Park, New York in the Western District of New York.  Defendant WILLIAM NEHILL was the   President   of   INTERNATIONAL   TECHNOLOGY.    INTERNATIONAL TECHNOLOGY was an importer of specialty metals, including magnesium powder.

4.    Defendant QIAN CHEN resided in the People's Republic of China  and  was  in  the  business  of  importing  specialty  metals, including magnesium powder, into the United States.  Defendant QIAN CHEN sought out Chinese manufacturers who could provide magnesium to defendant WILLIAM NEHILL for importation into the United States.

5.   Defendant INNOVATIVE MATERIALS & SOLUTIONS, INC. ("INNOVATIVE MATERIALS"), located in Brigham City, Utah, was a closely held corporation.  Defendant ELDON BOTT was the President of INNOVATIVE MATERIALS.  INNOVATIVE MATERIALS was also in the business of providing specialty metals.

**Countermeasure Flares and Magnesium**:

6.   The Department of Defense had a regular and ongoing need for countermeasure flares.  Countermeasure flares were used by United States military aircraft in order to defend against and divert heat-seeking missiles fired at the aircraft.  Ultra-fine ground magnesium powder or atomized magnesium powder was the major component contained inside a countermeasure flare.

7.   Ultra-fine ground magnesium powder was produced by milling and/or grinding a large magnesium ingot whereby very fine magnesium powder is produced.  The finer the grind of magnesium powder, the more volatile it becomes.  The size of any given particle of ground magnesium is usually measured by so-called "mesh" sizes, whereby the higher the mesh size, the more finely ground the particles.  In order to produce countermeasure flares, ultra-fine magnesium powder with a mesh size of between 200 and 325 is needed.  This means that the pure magnesium powder was required

to pass through a mesh in which, in every square inch of meshing, there were at least 200 openings.  Since 200-325 mesh-size magnesium powder is very fine and extremely volatile during any grinding process, such ultra-fine magnesium powder is usually handled in an environment containing inert gas to minimize the chance of explosion.

8.  Atomized magnesium powder was produced by heating, rather than grinding or filing, a large magnesium ingot until it takes a liquid form.  After various processes, the magnesium is cooled and perfectly round magnesium balls/grains are produced.

9.  The Department of Defense and its affiliated armed services had a regular and ongoing need for countermeasure flares used by military aircraft during military operations on behalf of the United States of America.  Kilgore Flares Company ("Kilgore Flares"), located in Toone, Tennessee, was in the business of, among other things, producing countermeasure flares for the United States Department of Defense.

10.  The Department of Defense purchased such countermeasure flares pursuant to specifications developed by the Department of Defense.  Those specifications include:

a.   **The Defense Federal Acquisition Regulations, also known as the "DFAR"**: The DFAR are federal regulations which establish specific requirements relative to the manufacture of products for the Department of Defense including ultra-fine ground magnesium powder or atomized magnesium powder utilized in the production of countermeasure flares. The DFARs are used by the National Technical Industrial Base in carrying out its duties and responsibilities, as set out below.

b.   **The National Technical Industrial Base, also known as "NTIB"**: The NTIB are rules promulgated by the Department of Defense which allow the Department of Defense to identify "critical assets," and in so doing, to require that such assets be rendered and produced within the geographical region of the United States and Canada, without reliance on outside powers or entities. The NTIB exists to ensure that, should the United States find itself in a military crisis, war or national emergency, the United States has the technical capability and underlying assets such that all of its critical defense needs are readily available. As such, the Department of Defense defines those "critical assets" under the NTIB. The NTIB not only defines what are "critical assets," but also establishes specific requirements relative to obtaining such assets, the production of such assets and the ultimate retention of such assets. Relative to the production of countermeasure flares, the NTIB establishes that the ultra-fine ground magnesium or atomized magnesium utilized in the production of countermeasure flares for the Department of Defense, must be either ground or atomized in the United States or Canada.

11.   The Department of Defense, over the course of years, developed specific and detailed military specifications, also known as "Mil-Specs", relative to the chemical and physical properties of ultra-fine ground magnesium powder or atomized magnesium powder to

be used in countermeasure flares.

12.   Persons and entities involved in the manufacture and production of countermeasure flares are required to comply with the appropriate Mil-Specs.

13.   Mil-Spec Mil-M-382 allowed for the separate use of either ultra-fine ground magnesium powder or atomized magnesium powder to produce countermeasure flares.   The Mil-Specs did not allow for a combination of ultra-fine ground magnesium powder and atomized powder to be used in countermeasure flares.

14.   NTIB further required that the magnesium used in countermeasure flares had to be ground or atomized in the United States or Canada.

15.   Ultra-fine ground magnesium powder and atomized magnesium powder, because of their volatility, had to be shipped/transported in steel drums.

16.   More coarsely-ground magnesium powder is less volatile and was not utilized in the countermeasure flare industry. Instead, such coarsely-ground magnesium was used in the steel industry as an alloy in the manufacturing of other metals or desulfurized steel.

17.   When coarsely-ground magnesium used in the steel industry is mixed with other inert materials, the combination is known as "magnesium desulfurization reagent."   Magnesium desulfurization reagent is usually composed of 90 percent magnesium and 10 percent inert materials.  Magnesium desulfurization reagent was used in the steel industry in order to remove impurities from the steel thereby making it stronger.   Since magnesium desulfurization reagent is coarsely-ground magnesium mixed with an inert material, it is less volatile than ultra-fine ground or atomized magnesium.   As such, magnesium desulfurization reagent may be shipped in "super sacks" rather than in steel drums.

18.   A magnesium reagent is essentially magnesium mixed with another element, and its characterization as a reagent is a term of art which is derived from the purpose of the use of such mixture based upon its chemical reactive properties.   In other words, it is not the mere mixing magnesium with another element that produces a magnesium reagent.   Rather, it is the effect and usage of the combination which makes it a reagent.

7

**The Anti-Dumping Order Established By The United States Department of Commerce and Its Enforcement By the Customs and Border Protection Agency:**

19.   The United States Government from time to time makes determinations as to duties or tariffs which are placed upon goods being imported into the United States.

20.   The United States Department of Commerce has primary responsibility for setting the duties and tariffs for a particular product/good.  Such duty/tariffs are established by the Department of Commerce either pursuant to statute, regulation or the policy interests of the United States.   In order to ensure that the interests of the United States are protected, the Department of Commerce has the authority to issue what is known as an "Anti-Dumping Order".

21.   At all relevant times to this Indictment, the Department of Commerce had in place an Anti-Dumping Order relative to magnesium which essentially provided as follows:

   a.   <u>Pure Magnesium (Under Anti-Dumping Order A-570-864-000)</u>:   When magnesium is being imported to the United States from China in its pure form, it will be subject to a 305.56% duty, meaning that a unit of magnesium valued at $1.00 would have a duty

8

imposed of $3.05 which would result in the total cost of the product being brought into the United States of approximately $4.05.

b. <u>Magnesium Reagent Under Anti-Dumping Order A-570-864-000)</u>: Magnesium reagent being imported into the United States from China has a 5% duty placed on it. Thus a $1.00 unit of magnesium reagent would have a duty of 5 cents and total cost of $1.05 for the good once imported.

22. Anti-Dumping Order A-570-864-000 allowed that any magnesium-based "reagent mixtures" containing 90% or less pure magnesium by weight plus one or more non-magnesium "granular" materials would be excluded from the 305.56% duty.

23. For the import of goods generally, and for the import of magnesium specifically under the aforementioned Anti-Dumping Orders, the United States Customs and Border Protection agency is charged with determining and ensuring that all such government laws, regulations, policies and orders are complied with, including the proper ascertainment and collection of duties and tariffs when those goods are imported.

**COUNT I**
**Conspiracy - 18 U.S.C. § 371**

**The Grand Jury Charges:**

24. The Introductory Allegations set forth in Paragraphs 1

through 23 are incorporated by reference and re-alleged as if fully set forth herein.

## A.   **OBJECTS OF THE CONSPIRACY**

25.   Beginning in or about February 2003, and continuing up to in or about December 2006, in the Western District of New York and elsewhere, the defendants, GREGORY MAGNESS, JUSTIN MAGNESS, SUPERIOR METAL POWDERS, INC., CHARLES WRIGHT, WILLIAM NEHILL, INTERNATIONAL TECHNOLOGY GROUP, INC., ELDON BOTT, INNOVATIVE MATERIALS & SOLUTIONS, INC., and QIAN CHEN, did knowingly, willfully and unlawfully combine, conspire and agree together with each other and with others, known and unknown:

(1) to defraud the United States that is, to obstruct by deceitful and dishonest means, the lawful and legitimate function of the United States Government, including the function of:

(a) the United States Department of Homeland Security, through the Customs and Border Protection and Immigration and Customs Enforcement agencies, to be provided with truthful and accurate information regarding the type and nature of materials being imported into the United States;

(b) the United States Department of Commerce and United States Customs and Border Protection to determine whether the substance being imported complied with the Anti-Dumping order; and

(c) the United States Department of Defense to

determine whether the substance being provided complied with the Defense Federal Acquisition Regulations "DFAR", with the applicable Mil-Specs, and with the contractual obligations owed to the United States; and

(2) to commit the following offenses against the United States:

(a) with intent to defraud the United States, to smuggle and clandestinely introduce into the United States merchandise by making false and fraudulent invoices, in violation of Title 18, United States Code, Section 545;

(b) to devise a scheme and artifice to defraud the United States and for obtaining money and property from the United States by means of false or fraudulent pretenses, representations or promise, and transmitting and causing to be transmitted, by wire communication in interstate or foreign commerce, writings for the purpose of executing the scheme or artifice in violation of Title 18, United States Code, Section 1343; and

(c) knowingly and willfully, within the jurisdiction of the executive branch of the Government of the United States, making materially false, fictitious and fraudulent statements and representations, and making and using false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in violation of Title 18, United States Code, Sections 1001(a)(1), 1001(a)(2) and § 1001(a)(3).

## B.   MANNER AND MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished in substance as follows:

11

26.   Prior to 2003, the exact date being unknown, defendant ELDON BOTT sought to become a source of supply of ultra-fine ground magnesium powder for the defense industry.

27.   Lacking the capability to grind pure magnesium to the levels required for the production of countermeasure flares, in or about 2002 or early 2003, defendant ELDON BOTT discussed with defendant GREG MAGNESS a potential business opportunity which involved supplying ultra-fine ground magnesium powder to produce countermeasure flares for the defense industry.

28.   Defendant GREG MAGNESS, who also lacked the ability to grind magnesium down to the ultra-fine levels required for the countermeasure flares, contacted defendant CHARLES WRIGHT, then-president of ESM, about ESM becoming a supplier of fine-ground magnesium powder to the defense industry.

29.   Sometime in late 2002 or early 2003, the exact date being unknown, defendant CHARLES WRIGHT, as President of ESM, entered into a separate consulting agreement with defendants GREGORY MAGNESS and JUSTIN MAGNESS of defendant SUPERIOR METAL and defendant ELDON BOTT of defendant INNOVATIVE MATERIALS.  Pursuant to the agreement, defendants GREGORY MAGNESS, JUSTIN MAGNESS and ELDON BOTT would receive a commission based upon the amount of

ground magnesium powder ESM sold to the countermeasure flare industry.


30.   In defendant GREG MAGNESS' discussions with defendant CHARLES WRIGHT and other employees of ESM, it was agreed that the ultra-fine ground magnesium powder needed to make the countermeasure flares would be imported from the People's Republic of China rather than from the United States or Canada as required by the aforementioned DFAR and NTIB.  It was agreed that the ultra-fine ground magnesium powder would be imported into the United States labeled as magnesium reagent and/or magnesium desulfurization reagent in order to avoid the 305.56% Anti-Dumping duty.  The parties also agreed that by mixing the ultra-fine ground magnesium powder with aluminum nuggets and by calling it magnesium reagent, they would import such substance into the United States at the 5% duty rate rather than the appropriate 305% duty rate.


31.   Subsequent to late 2002 or early 2003, the exact date being unknown, defendants ELDON BOTT, GREGORY MAGNESS and JUSTIN MAGNESS, along with representatives of ESM, approached representatives of Kilgore Flares in order to become an approved supplier of ultra-fine ground magnesium powder that Kilgore Flares would use to produce countermeasure flares sold to the defense

industry.

32. On or about October 24, 2004, the United States
Department of Defense entered into a contract with Kilgore Flares
to produce countermeasure flares.  The contract required Kilgore
Flares to manufacture approximately 1.8 million countermeasure
flares for the Department of Defense at a cost of approximately $42
million dollars.

33. The contract entered between the Department of Defense
and Kilgore Flares contained two contract restrictions with respect
to the magnesium powder used for the production of the
countermeasure flares.  The first restriction required that the
production and procurement of the magnesium to produce the flares
be from either the United States or Canadian industrial bases.  The
second restriction required that there be no blending of ground and
atomized magnesium powder.

34. In order to fulfill its contractual obligations with the
Department of Defense, Kilgore Flares entered into an agreement
with ESM and defendant SUPERIOR METAL to supply Kilgore Flares with
the required magnesium powder needed to produce the countermeasure
flares.  In order to produce the countermeasure flares, Kilgore
required ESM to provide it with ultra-fine ground magnesium powder

with a mesh size between 200 and 325.  Both ESM and defendant SUPERIOR METAL were advised that the ultra-fine ground magnesium powder had to be produced in either the United States or Canada, and that there could be no blending of ground magnesium powder and atomized magnesium powder.

35.  Defendants GREGORY MAGNESS and JUSTIN MAGNESS, on behalf of defendant SUPERIOR METAL, entered into an agreement with defendant WILLIAM NEHILL, whereby defendant NEHILL would import, with the assistance of defendant QIAN CHEN, from the People's Republic of China, ultra-fine ground magnesium powder mixed with 1/4 inch aluminum nuggets.

36.  Defendant QIAN CHEN located industrial facilities in China capable of producing either pure fine ground magnesium powder or atomized magnesium powder with the 1/4 inch aluminum nuggets added to the magnesium powder.  The pure fine ground magnesium powder would be placed in sealed drums and shipped for importation into the United States.

37.  Defendant WILLIAM NEHILL and defendant QIAN CHEN also determined that the drums would be labeled, and the invoices and bills of lading would falsely and fraudulently describe the product as being, "magnesium reagent" and/or "magnesium desulfurization

reagent."

38.  Defendants WILLIAM NEHILL and QIAN CHEN also agreed to keep two sets of invoices regarding the cost of the product actually being imported into the United States.

39.  It was agreed between defendants WILLIAM NEHILL and QIAN CHEN that if the true price of the "magnesium reagent" was placed on the invoice presented at importation, Customs and Border Protection officials would realize that the product was not "magnesium reagent" but the more expensive fine pure magnesium powder.  Thus, defendants WILLIAM NEHILL and QIAN CHEN agreed to create a second set of invoices to be used only for importation purposes which would not only describe the product as being "magnesium reagent" or "magnesium desulfurization reagent" but would also reflect the price as if it were "magnesium desulfurization reagent," even though the actual price was for the higher-cost pure magnesium powder.  The true cost of the finely-ground pure magnesium powder to ESM was approximately $2.40 per pound, and the true cost of the atomized pure magnesium powder was approximately $7.60 per pound.  However, the invoices created to defraud Customs and Border Protection falsely and fraudulently indicated that the cost of the substance imported was approximately

90 cents per pound.  That price is the approximate equivalent price of genuine "magnesium desulfurization reagent."

40.  Once entered into the United States, the falsely labeled drums (*i.e.*, those labeled as "magnesium reagent" or "magnesium desulfurization reagent") were shipped to ESM's industrial facility at Saxonburg, PA, or to a nearby holding warehouse at S. H. Bell in Braddock, PA.  In addition, the invoice accompanying the aluminum nugget laced magnesium powder falsely described the product as "magnesium reagent", "magnesium desulfurization reagent", or a variation thereof.

41.  Once the product was delivered, defendant SUPERIOR METAL sent an invoice or bill to ESM which described the delivered product in various terms but always included the term "reagent" within the invoice.  While true magnesium reagent, which had been received by ESM for years, would have been appropriately shipped in "super sacks" the falsely labeled "magnesium reagent", because of its volatility, was shipped in steel drums.

42.  After the fine pure magnesium powder with aluminum nuggets arrived at ESM, defendant JUSTIN MAGNESS or defendant GREG MAGNESS would, on occasion, send, typically by fax a summary of the order and the final price to be paid by ESM to defendant SUPERIOR

METAL.  The summary broke down the actual contents of the product being delivered, but generally never referred to the product as "reagent" and never included a price for the aluminum nuggets.

43.  The product received at ESM would then be emptied from the large drums into bins for the purpose of separating the relatively large aluminum nuggets from the pure magnesium powder. After separating the aluminum nuggets from the fine pure magnesium powder, the pure fine ground magnesium powder was placed back into drums.

44.  ESM then sold the ultra-fine magnesium powder imported from the People's Republic of China to Kilgore Flares.

45.  In addition to providing Kilgore Flares with Chinese-produced ultra-fine ground magnesium powder, ESM also provided Kilgore Flares with ultra-fine ground magnesium powder mixed with atomized magnesium powder in violation of the aforementioned Mil-Specs.

46.  Kilgore Flares used the imported Chinese magnesium powder it obtained from ESM as well as the mixed ground and atomized magnesium powder it also obtained from ESM to produce countermeasure flares which it sold to the Department of Defense

pursuant to the October 24, 2004, contract.

47.   In order to facilitate payment from Kilgore Flares to ESM for the imported Chinese magnesium powder, defendant ELDON BOTT and a representative from ESM, prepared and forwarded to Kilgore Flares Certificates of Compliance that falsely certified that ultra-fine magnesium powder ESM supplied Kilgore Flares complied with the Department of Defense contract requirements.

48.   Kilgore Flares relied upon the false Certificates of Compliance in order to obtain payment from the Department of Defense for the countermeasure flares it provided pursuant to the contract.

### C.   <u>**OVERT ACTS**</u>

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the Western District of New York and elsewhere:

49.   (a)  On or about July 30, 2003, 16 metric tons of pure fine ground magnesium powder were imported into the United States from China by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS and shipped to ESM with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b) The duty paid for the importation of the pure magnesium on or about July 30, 2003, was $1,260.00, whereas, the correct duty owed was approximately $177,647.30.

50. (a) On or about November 17, 2004, 18.88 metric tons of pure fine ground magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b) The duty paid for the importation of the pure magnesium on or about November 17, 2004, was $1,765.30, whereas the correct duty owed was $373,638.18.

51. (a) On or about November 29, 2004, 18.88 metric tons of pure fine ground magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b) The duty paid for the importation of the 18.88 metric tons of pure magnesium on or about November 29, 2004, was $1,765.30, whereas the correct duty owed was $373,638.18.

52.  (a)  On or about November 29, 2004, 14 metric tons of pure magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS  into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)  The duty paid for the importation of the 14 metric tons of pure magnesium on or about November 29, 2004, was $1,309.00, whereas the correct duty owed was $162,729.00.

53.  (a)  On or about December 3, 2004, 14.8 metric tons of pure magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS  into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)  The duty paid for the importation of the pure magnesium on or about December 3, 2004, was $1,332.00, whereas, the correct duty owed was $93,124.38.

54.  On or about December 14, 2004, an invoice for atomized magnesium in the amount of $82,797.45 was faxed from defendant

21

SUPERIOR METAL located in Franklin, Pennsylvania, to ESM, located in Amherst, New York.

55.   On or about December 14, 2004, an invoice was faxed from defendant INTERNATIONAL TECHNOLOGY, located in Orchard Park, New York to defendant SUPERIOR METAL located in Franklin, Pennsylvania, for ground and atomized magnesium powder in the amount of $146,958.45.

56.   (a)   On or about December 16, 2004, 14.95 metric tons of pure magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)   The duty paid for the importation of the pure magnesium on or about December 16, 2004, was $1,352.00, whereas the correct duty owed was $348,205.96.

57.   On or about December 21, 2004, an invoice was faxed from defendant INTERNATIONAL TECHNOLOGY located in Orchard Park, New York to defendant SUPERIOR METAL, located in Franklin, Pennsylvania, for ground and atomized magnesium powder in the amount of $152,161.31.

58.  On or about December 27, 2004, an invoice was faxed from defendant INTERNATIONAL TECHNOLOGY, located in Orchard Park, New York to defendant SUPERIOR METAL located in Franklin, Pennsylvania, for ground and atomized magnesium powder in the amount of $131,908.29.

59.  (a)  On or about December 29, 2004, 29.6 metric tons of pure magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)  The duty paid for the importation of the pure magnesium on or about December 29, 2004, was $2,664.00, whereas the correct duty owed was $186,248.76.

60.  On or about January 10, 2005, an e-mail regarding finding an alternative use for the aluminum nuggets being shipped with the magnesium was sent from defendant CHARLES WRIGHT located in Amherst, New York, to an individual located in Saxonburg, Pennsylvania.

61.  On or about January 14, 2005, an e-mail discussing new drum labeling and a color system for identifying the ground and

atomized magnesium powder was sent from ESM in Amherst, New York, to defendant GREGORY MAGNESS in Franklin, Pennsylvania.

62.  (a)  On or about January 27, 2005, 9.68 metric tons of pure magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)  The duty paid for the importation of the pure magnesium on or about January 27, 2005, was $905.10, whereas the correct duty owed was $399,054.90.

63.  On or about February 9, 2005, an invoice for atomized magnesium powder was faxed from defendant SUPERIOR METAL located in Franklin, Pennsylvania to ESM, located in Amherst, New York, in the amount of $151,794.97.

64.  (a)  On or about February 23, 2005, 16.56 metric tons of pure magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)   The duty paid for the importation of the pure magnesium on or about February 23, 2005, was $1,548.34, whereas the correct duty owed was $350,651.55.

65.  (a)  On or about March 8, 2005, 16.28 metric tons of pure magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)   The duty paid for the importation of the pure magnesium on or about March 8, 2005, was $1,552.20, whereas the correct duty owed was $151,384.46.

66.  (a)  On or about March 18, 2005, 31.68 metric tons of pure magnesium powder was imported by defendant WILLIAM NEHILL at the request of defendants GREGORY MAGNESS and JUSTIN MAGNESS into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)   The duty paid for the importation of the pure magnesium on or about March 18, 2005, was $2,962.10, whereas the correct duty owed was $563,668.46.

67.   On or about March 29, 2005, an e-mail concerning the discovery of the scheme to smuggle the magnesium into the United States as a reagent was sent from defendant WILLIAM NEHILL located in Orchard Park, New York to defendant QIAN CHEN located in the People's Republic of China.

68.   (a)  On or about May 2, 2005, 15.8 metric tons of pure magnesium powder was imported into the United States from China mixed with large aluminum nuggets and falsely invoiced as magnesium reagent.

(b)  The duty paid for the importation of the pure magnesium on or about May 2, 2005, was $1,477.30, whereas the correct duty owed was $469,242.24.

69.   On or about May 12, 2005, an invoice for atomized magnesium powder was faxed from defendant SUPERIOR METAL located in Franklin, Pennsylvania to ESM, located in Amherst, New York in the amount of $151,798.62.

70.   On or about June 2, 2005, e-mail communications were sent between defendant ELDON BOTT in Brigham City, Utah, and John Carter at Kilgore Flares in Toone, Tennessee, about having defendant ELDON BOTT or a representative from ESM present during a mixing of a new

26

blend of magnesium (ground magnesium and atomized magnesium) supplied by ESM to Kilgore Flares in the event any anomalies were encountered.

71.   On or about June 30, 2006, an e-mail was sent by Douglas Lee from Amherst, New York to John Carter at Kilgore Flares in Toone, Tennessee certifying the magnesium supplied by ESM complied with Department of Defense requirements.

72.   On or about July 29, 2005, check number 44988 from ESM's J.P. Morgan Chase Bank account in Amherst, New York was made payable to defendant ELDON BOTT and deposited into the Box Elder County Credit Union account of defendant ELDON BOTT located in Brigham City, Utah in the amount of $12,512.50 as commissioned sales of magnesium powder provided to Kilgore Flares.

73.   On or about August 5, 2005, a wire transfer was sent from ESM's J.P. Morgan Chase Bank account in Amherst, New York to a National City Bank account utilized by defendants SUPERIOR METAL, GREGORY MAGNESS, and JUSTIN MAGNESS in Franklin, Pennsylvania in the amount of $242,097.84.

74.   On or about September 30, 2005, check number 46892 drawn

from ESM's J.P. Morgan Chase Bank account in Amherst, New York was made payable to defendant ELDON BOTT and deposited into defendant BOTT's account at the Zions Bank in Brigham City, Utah in the amount of $10,010.00.

75.   On or about November 14, 2005, a wire transfer from the J.P. Morgan Chase Bank account of ESM was sent to defendant SUPERIOR METAL's National City Bank account in Grove City, Pennsylvania in the amount of $343,471.60.

76.   On or about March 15, 2006, a wire transfer from the J.P. Morgan Chase Bank account of ESM was sent to the account of defendant SUPERIOR METAL at the National City Bank in Grove City, Pennsylvania in the amount of $141,553.52.

77.   On or about May 22, 2006, a wire transfer from the Bank of America bank account of ESM was sent to the account of defendant SUPERIOR METAL at the National City Bank in Grove City, Pennsylvania in the amount of $83,252.80.

78.   On or about June 30, 2006, ESM check number 4029 drawn from ESM's Bank of America bank account was made payable to defendants ELDON BOTT and INNOVATIVE MATERIALS and deposited in the

account of defendant ELDON BOTT at the Zion Bank in Brigham City, Utah in the amount of $10,115.00.

79.   On or about August 25, 2006, check number 5516 from ESM's Bank of America account was made payable to defendant ELDON BOTT and deposited into the account of defendants ELDON BOTT and INNOVATIVE MATERIALS and Nancy Bott at the Zions Bank in Brigham City, Utah in the amount of $10,027.50 for commissioned sales of magnesium powder.

80.   On or about August 31, 2006, a wire transfer from ESM's Bank of America account was sent to the National City Bank account in Grove City, Pennsylvania of defendant SUPERIOR METAL in the amount of $188,137.84.

81.   On or about December 18, 2006, a wire transfer from ESM's Bank of America account was sent to the National City Bank account of defendant SUPERIOR METAL in Grove City, Pennsylvania in the amount of $106,696.48.

**All in violation of Title 18, United States Code, Section 371.**

<u>**COUNT 2**</u>

29

**Wire Fraud - 18 U.S.C. §§ 1343 & 2**

**The Grand Jury Further Charges:**

1.   From in or about December 2004, and continuing to in or about December 2006, in the Western District of New York and elsewhere, the defendants, GREGORY MAGNESS, JUSTIN MAGNESS, SUPERIOR METAL POWDERS, INC., CHARLES WRIGHT, WILLIAM NEHILL, INTERNATIONAL TECHNOLOGY GROUP, INC., ELDON BOTT, and INNOVATIVE MATERIALS & SOLUTIONS, INC., did knowingly and intentionally devise a scheme and artifice to defraud the United States and for obtaining money and property from the United States by means of false and fraudulent pretenses, representations and promises.

2.   (a) The defendants committed, caused the commission of and aided, counseled, commanded, induced and procured others to defraud the United States and Kilgore Flares by the following means and methods, among others:

(b)   The allegations set forth in Paragraph 1 through 23 of the Introductory Allegations and Paragraphs 24 through 81 of Count 1 are incorporated by reference and re-alleged as if fully set forth herein.

3.   For the purpose of executing the aforementioned scheme and artifice, on or about the dates set forth in the below table, the defendants did knowingly transmit and cause to be transmitted, by

means of wire communication in interstate and foreign commerce, the items described below:

| Date | Description |
|------|-------------|
| 05/12/05 | Invoice for atomized magnesium powder was faxed from Superior Metal Powders, Inc. in Franklin, Pennsylvania to ESM Group, Inc. located in Amherst, New York in the amount of $151,798.62. |
| 06/01/05 | E-mail from ELDON BOTT in Brigham City, Utah was sent to John Carter at Kilgore Flares in Toone, Tennessee regarding blending ground and atomized magnesium powder. |

**All in violation of Title 18, United States Code, Sections 1343 and 2.**

## First Forfeiture Allegation
### 18 U.S.C. Section 981(a)(1)(C)

**The Grand Jury Further Alleges:**

1.   As a result of any of their convictions under count 1 of the Indictment, the defendants, GREGORY MAGNESS, JUSTIN MAGNESS, SUPERIOR METAL POWDERS, INC., CHARLES WRIGHT, WILLIAM NEHILL, INTERNATIONAL TECHNOLOGY GROUP, INC., ELDON BOTT, INNOVATIVE MATERIALS & SOLUTIONS, INC., and/or QIAN CHEN, jointly and severally, shall forfeit to the United States any property, real or personal, which constitutes  or is derived from proceeds traceable to any of the offenses for which they are convicted, the following property:

A.    <u>**MONETARY AMOUNTS**</u>

2.    The sum of SIX MILLION, SIXTY THOUSAND, FIVE HUNDRED AND SIXTY-FOUR DOLLARS AND FORTY NINE CENTS ($6,060,564.49) United States currency.


3.    The sum of FIVE MILLION, NINE HUNDRED AND THIRTEEN THOUSAND AND TWENTY-TWO DOLLARS AND SEVEN CENTS ($5,913,022.07) United States currency.



B.    <u>**MONIES AND CONTENTS FORMERLY CONTAINED WITHIN CERTAIN FINANCIAL INSTITUTIONS**</u>

4.    An interest up to the amount of $75,000.00 United States currency in Northwest Savings Bank insured money fund account number 2226005995, account holder Norma and defendant GREGORY MAGNESS;


5.    An interest up to the amount of $240,000.00 United States currency on Fidelity Investment account number HTK 047 112, account holder Norma J. Magness and defendant GREGORY MAGNESS;


6.    An interest up to the amount of $7,000.00 United States currency on Fidelity Investment account number HTK 047 104, account

holder Norma J. Magness;

7.   An interest up to the amount of $7,000.00 United States currency on Fidelity Investment account number HTK 047 090, account holder defendant GREGORY MAGNESS;

8.   An interest up to the amount of $72,707.12 in defendant SUPERIOR METAL POWDERS account number 967054690, held at National City Bank of PA.;

9.   The sum of $4,276.22 United States currency, which represents monies seized from M&T Bank account number 16073355, account holder defendant INTERNATIONAL TECHNOLOGY GROUP, INC.;

10.   The sum of $185,807.40 United States currency, which represents monies seized from M&T Bank account number 01D604488, account holder defendant WILLIAM NEHILL;

11.   An interest up to the amount of $37,660.00 United States currency in Edward Jones account number 802-10338-1-9, account holder defendant INNOVATIVE MATERIALS & SOLUTIONS, INC.;

12.   An interest up to the amount of $18,000.00 United States

currency in Edward Jones account number 802-94260-1-5, account holder Nancy Bott.

## C. <u>SUBSTITUTE ASSETS</u>

13. If any of the property described above, as a result of any act or omission of the defendants:

    a) cannot be located upon the exercise of due diligence;
    b) has been transferred or sold to, or deposited with, a third party;
    c) has been placed beyond the jurisdiction of the Court;
    d) has been substantially diminished in value; or
    e) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property of the defendants up to the value of the above-referenced property, including but not limited to the following assets:

**AS TO DEFENDANT GREGORY MAGNESS:**

14. (a) An interest up to the amount of $75,000.00 United States currency in Northwest Savings Bank insured money fund account number 2226005995, account holder Norma and defendant GREGORY MAGNESS;

(b) An interest up to the amount of $240,000.00 United States currency on Fidelity Investment account number HTK 047 112, account

34

holder Norma J. Magness and defendant GREGORY MAGNESS;

(c)   An interest up to the amount of $7,000.00 United States currency on Fidelity Investment account number HTK 047 104, account holder Norma J. Magness;

(d)   An interest up to the amount of $7,000.00 United States currency on Fidelity Investment account number HTK 047 090, account holder  defendant GREGORY MAGNESS;

(e)   An interest up to the amount of $72,707.12 in defendant SUPERIOR METAL POWDERS, INC. account number 967054690, held at National City Bank of PA.;

(f)   The premises and real property with all buildings, appurtenances, and improvements located at 289 Palm Hill Road, Polk, Pennsylvania.

**AS TO DEFENDANT JUSTIN MAGNESS:**

15.   The premises and real property with all buildings, appurtenances, and improvements located 386 Rynd Farm Road, Oil City, Pennsylvania.

**AS TO DEFENDANT CHARLES WRIGHT:**

16.   The premises and real property with all buildings, appurtenances, and improvements located 403 Glengrove Road, Youngstown, New York.

**AS TO DEFENDANT WILLIAM NEHILL:**

17.   (a)   The sum of $4,276.22 United States currency, which represents monies seized from M&T Bank account number 16073355, account holder defendant INTERNATIONAL TECHNOLOGY GROUP, INC.;

(b)   The sum of $185,807.40 United States currency, which represents monies seized from M&T Bank account number 01D604488, account holder William Nehill;

(c)   The premises and real property with all buildings, appurtenances, and improvements located 60 Briar Hill, Orchard Park, New York.

**AS TO DEFENDANT ELDON BOTT:**

18.   (a)   An interest up to the amount of $37,660.00 United States currency in Edward Jones account number 802-10338-1-9, account holder defendant INNOVATIVE MATERIALS & SOLUTIONS, INC.;

(b)   An interest up to the amount of $18,000.00 United States currency in Edward Jones account number 802-94260-1-5, account holder Nancy Bott.

(c)   The premises and real property with all buildings, appurtenances, and improvements located 748 N 400 E, parcel number 03-182-0050, Brigham City, Utah;

(d)   The premises and real property with all buildings, appurtenances, and improvements identified as Parcel number 031210047, Box Elder County, Utah;

(e)   The premises and real property with all buildings, appurtenances, and improvements identified as Parcel number 031210048, Box Elder County, Utah.

**All pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c).**

## Second Forfeiture Allegation
## 18 U.S.C. Section 981(a)(1)(C)

**The Grand Jury Further Alleges:**

1.   As a result of any of their convictions from Count 2 of the Indictment, the defendants, GREGORY MAGNESS, JUSTIN MAGNESS, SUPERIOR METAL POWDERS, INC., CHARLES WRIGHT, WILLIAM NEHILL, INTERNATIONAL TECHNOLOGY GROUP, INC., ELDON BOTT, and/or INNOVATIVE MATERIALS & SOLUTIONS, INC., jointly and severally, shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense of conviction, of the following properties:

A.   **MONETARY AMOUNT**

2.   The sum of ONE HUNDRED FIFTY ONE THOUSAND SEVEN HUNDRED NINETY EIGHT DOLLARS AND SIXTY TWO CENTS ($151,798.62) United States currency.

B.   **SUBSTITUTE ASSETS**

3.   If any of the properties described above, as a result of any act or omission of the defendants:

38

a)   cannot be located upon the exercise of due diligence;
b)   has been transferred or sold to, or deposited with, a third party;
c)   has been placed beyond the jurisdiction of the Court;
d)   has been substantially diminished in value; or
e)   has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property of the defendants, up to the value of the above-referenced properties, including but not limited to the following assets:

All properties previously referenced in the First Forfeiture Allegation above are incorporated by reference as if fully set forth herein.

**All pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C) and 1343; and Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c).**

DATED: Buffalo, New York.  April   30  , 2010

WILLIAM J. HOCHUL, JR.
United States Attorney


BY:  S/MICHAEL DIGIACOMO
MICHAEL DIGIACOMO
Assistant U.S. Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5700 ext. 885
Michael.digiacomo@usdoj.gov


A TRUE BILL:


S/FOREPERSON
FOREPERSON